**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Flipdaddy's, LLC., | ) | Case No. 1:18-bk-14408 |
|  | ) |  |
| Debtor. | ) | Chief Judge Jeffrey P. Hopkins |
|  | ) |  |

**DISCLOSURE STATEMENT FOR**
**THE CHAPTER 11 PLAN OF REORGANIZATION**
**OF FLIPDADDY'S, LLC**

DILLER  & RICE, LLC
Steven L. Diller (0023320)
124 E. Main Street
Van Wert, Ohio  45891
Telephone (419) 238-5025
Facsimile (419) 238-4705
E-mail: steven@drlawllc.com

Attorneys for Flipdaddy's, LLC
Debtor-in-Possession

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH
BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE
SECTION 1126. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS
NOT YET BEEN APPROVED. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL
THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE
INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE
STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER
TO BUY ANY SECURITIES.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO
HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE FOR PURPOSES OF SOLICITING VOTES TO
ACCEPT OR REJECT THE *CHAPTER 11 PLAN OF FLIPDADDY'S, LLC.*. NOTHING IN THIS DISCLOSURE
STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE
DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD
CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE
RISK FACTORS DESCRIBED IN ARTICLE VII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTOR AND CERTAIN HOLDERS OF CLAIMS AND INTERESTS
THAT HAVE EXECUTED THE CONTRIBUTION AND BACKSTOP COMMITMENT
AGREMENT, INCLUDING THE SOLE MEMBER HOLDING CLASS A MEMBERSHIP
VOTING INTERESTS, APPROXIMATELY 91 PERCENT OF EXISTING CLASS B MEMBERSHIP
INTERESTS, AND A MATERIAL AMOUNT OF APPROXIMATELY 760,000.00 OF THE CONVERTIBLE
NOTES IN EXISTENCE.   THE DEBTOR URGES HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTES ARE
BEING SOLICITED TO VOTE TO ACCEPT THE PLAN.

THE DEBTOR URGE EACH HOLDER OF A CLAIM OR INTEREST ENTITLED TO VOTE TO CONSULT
WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS
ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS
CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE
ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT
CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN,
CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE CHAPTER 11 CASE.
ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE
SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE
ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH
ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A
DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY
OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS
WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT HAS BEEN PROVIDED BY THE DEBTOR' MANAGEMENT, EXCEPT WHERE OTHERWISE
SPECIFICALLY NOTED. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION
CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA
DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE
DEBTOR'S LOCATIONS AND BUSINESS. WHILE THE DEBTOR BELIEVES THAT SUCH FINANCIAL
INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE
HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE
BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY
OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE
DEBTOR'S BUSINESS AND THE FUTURE RESULTS AND OPERATIONS. THE DEBTOR EXPRESSLY
CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS

CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTOR OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AND INTERESTS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR INTERESTS OR OBJECTIONS TO CLAIMS OR INTERESTS.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIMS ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE CONTRIBUTION AND BACKSTOP COMMITTMENT AGREEMENT.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN, OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE VI, ENTITLED "RISK FACTORS," WHICH BEGINS ON PAGE 37, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN. THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTOR ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING VOTES FOR THE ACCEPTANCES AND CONFIRMATION OF THE PLAN AND MAY NOT BE

RELIED ON FOR ANY OTHER PURPOSE. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTOR HAS SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY A N Y  INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE. OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS. TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTOR IS MAKING STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. THE DEBTOR CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS TO BE FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTOR'S:

- BUSINESS STRATEGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- RESTAURANT PRICES AND THE OVERALL HEALTH OF THE R E S T A U R A N T  I N D U S T R Y ;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES;

- AVAILABILITY AND TERMS OF CAPITAL;

- SUCCESSFUL RESULTS FROM THE DEBTOR'S OPERATIONS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTOR'S CASH POSITION AND LEVELS OF INDEBTEDNESS;

- COSTS OF CONDUCTING THE DEBTOR'S OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- UNCERTAINTY REGARDING THE DEBTOR' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- THE ADEQUACY OF THE DEBTOR' CAPITAL RESOURCES AND LIQUIDITY; AND

- THE DEBTOR' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS.

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTOR'S FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTOR'S ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTOR UNDERTAKES NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING: THE DEBTOR'S ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTOR MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE DEBTOR'S ABILITY TO REDUCE ITS OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASE ON THE DEBTOR'S OPERATIONS, MANAGEMENT, AND EMPLOYEES; THE RISKS ASSOCIATED WITH OPERATING THE DEBTOR'S BUSINESS DURING THE CHAPTER 11 CASE; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTOR'S INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTOR'S MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE AFFECTING THE DEBTOR'S CUSTOMER BASE; THE DEBTOR'S ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; NATURAL DISASTERS; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTOR' BUSINESS.**

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION.    1

II.    PRELIMINARY STATEMENT.    1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE    2
STATEMENT  AND PLAN.
A.    What is chapter 11?    2
B.    Why is the Debtor sending me this Disclosure Statement?    2
C.    Am I entitled to vote on the Plan?    3
D.    What will I receive from the Debtor if the Plan is consummated?    3
E.    What will I receive from the Debtor if I hold an Allowed Administrative    5
Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?
F.    Are there any regulatory approvals required to consummate the Plan?    7
G.    What happens to my recovery if the Plan is not confirmed or does not    7
go effective?
H.    If the Plan provides that I get a distribution, do I get it upon Confirmation    7
or when the Plan goes effective, and what is meant by "Confirmation,"
"Effective Date," and "Consummation?"
I.    Is there potential litigation related to the Plan?    7
J.    How will the preservation of the Causes of Action impact my recovery    8
under the Plan?
K.    Will there be releases and exculpation granted to parties in interest as    9
part of the Plan?
L.    How do I vote for or against the Plan?    13
M.    What is the deadline to vote on the Plan?    13
N.    When is the Confirmation Hearing set to occur?    13
O.    What is the purpose of the Confirmation Hearing?    13
P.    What is the Rights Offerings?    13
Q.    Who do I contact if I have additional questions with respect to this    13
Disclosure Statement or the Plan?
R.    Does the Debtor recommend voting in favor of the Plan?    14
S.    Who supports the Plan?    14

IV.    THE DEBTOR'S CONTRIBUTION AND BACKSTOP COMMITMENT    14
AGREEMENT AND PLAN

A.    The Contribution and Backstop Commitment Agreement    14
B.    The Plan.    15

V.    DEBTOR'S CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.    16

A.    The Company's Corporate History.    16
B.    Scope of Operations.    17
C.    The Debtor's Prepetition Capital Structure.    17

VI.   EVENTS LEADING TO THE CHAPTER 11 FILINGS                          18

    A.   The Decision to Seek to Develop Orange Beach.                  18
    B.   Litigation.                                                    19


VII.   MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASE.        19

    A.   Material Post Filing Events                                    19
    B.   Corporate Structure Upon Emergence                             21
    C.   The Contribution and Backstop Commitment Agreement             22

VIII.   RISK FACTORS                                                    24
    A.   Bankruptcy Law Considerations.
    B.   Risks Related to Recoveries Under the Plan                     28
    C.   Risks Related to the Debtor's and the Reorganized Debtor's Business.   29

IX.   SOLICITATION AND VOTING PROCEDURES.                              31

    A.   Holders of Claims and Interests Entitled to Vote on the Plan.   32
    B.   Voting Record Date.                                            32
    C.   Voting on the Plan.                                            32
    D.   Ballots Not Counted                                            33

X.   RIGHTS OFFERING PROCEDURES.                                       33

XI.   CONFIRMATION OF THE PLAN.                                        34

    A.   Requirements for Confirmation of the Plan.                     34
    B.   Best Interests of Creditors/Liquidation Analysis.              34
    C.   Feasibility.                                                   35
    D.   Acceptance by Impaired Classes.                                35
    E.   Confirmation without Acceptance by All Impaired Classes.       36
    F.   Valuation of the Debtor.                                       37

XII.   CERTAIN SECURITIES LAW MATTERS.                                 37

    A.   New Membership Interests and Resale of New Membership Interests.   37
    B.   Backstop Commitment Agreement.                                 38

XIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX                       38
        CONSEQUENCES OF THE PLAN.

    A.   Introduction.                                                  38
    B.   Certain U.S. Federal Income Tax Consequences to the Debtor and   39
        Reorganized Debtor.

XIV.   RECOMMENDATION                                                  40

**EXHIBITS**

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Contribution and Backstop Commitment Agreement

EXHIBIT C      Proposed Disclosure Statement Order

EXHIBIT D      Liquidation Analysis

EXHIBIT E      Financial Projections

## I.     INTRODUCTION.

Flipdaddy's, LLC ("Flipdaddy's"), as Debtor and Debtor-in-possession ("Debtor and/or the "Company"), submit this disclosure statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to Holders of Claims against and Interests in the Debtor in connection with the solicitation of votes for acceptance of the *Chapter 11 Plan of Reorganization of Flipdaddy's, LLC* (the "Plan"), filed contemporaneously herewith.[1] A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.

**THE DEBTOR, AND CONSENTING STAKEHOLDERS INCLUDING THE SOLE MEMBER HOLDING CLASS A MEMBERSHIP VOTING INTERESTS, APPROXIMATELY 91 PERCENT OF EXISTING CLASS B MEMBERSHIP INTERESTS, AND APPROXIMATELY 93 PERCENT OF THE CONVERTIBLE NOTES IN EXISTENCE HAVE EXECUTED THE CONTRIBUTION AND BACKSTOP COMMITMENT AGREEMENT AND SUPPORT CONFIRMATION OF THE PLAN. A COPY OF THE CONTRIBUTION AND BACKSTOP COMMITMENT AGREEMENT IS ATTACHED AS EXHIBIT B AND INCORPORATED HEREIN BY REFERENCE. IN ADDITION, THE DEBTOR HAS REACHED AGREEMENT WITH ALL LANDLORDS FOR THE ASSUMPTION AND CURING OF LEASES FOR ALL LOCATIONS, ASSUMPTION AND CURING OF THE MASTER DISTRIBUTION AGREEMENT WITH GORDON FOOD SERVICE AND AGREEMENT WITH THE DEBTOR'S PRIMARY LENDER, PARK NATIONAL BANK FOR THE ASSUMPTION AND TREATMENT OF ITS LOANS. THE DEBTOR BELIEVES THAT THE PROPOSALS AND COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTOR'S ESTATE, AND PROVIDES THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, THE DEBTOR BELIEVES THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THIS CHAPTER 11 CASE. ACCORDINGLY, THE DEBTOR STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT.

Flipdaddy's was founded in 2010 by Bob Dames. Prior to creation of Flipdaddy's, Mr. Dames was a salesman who as a result of his travel requirements would often ask hotel clerks where he could get a "good burger and a beer." This question ultimately led Mr. Dames into to a five-year-long process of research and seeking funding for the project. That process led to a proprietary blend of beef used for the burgers, imaginative twists in presentation and utilization of local craft beers that is the brand of Flipdaddy's Brilliant Burgers and Craft Beer Bar.

---

[1]   Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms   in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of   any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan will govern.**

This ultimately led to the opening of the first location in the village of Mariemont, Ohio and since that opening, the Company has continued to expand, opening its fourth location in Newport Kentucky in 2015. This location was the first location built from the ground up, was a combination of the continuing development of the Flipdaddy's theme and brand, was the largest

of all the Flipdaddy's locations and was immediately the largest source of revenue to the Company. At that time all four Flipdaddy's locations were within the Cincinnati metropolitan area, though Mr. Dame's vision always included the Flipdaddy's would be a national brand.

In July of 2017, Mr. Dames spearheaded the opening of a fifth location in Orange Beach, Baldwin County Alabama. Orange Beach is located along the Gulf of Mexico and the easternmost community on Alabama's Gulf Coast. Unfortunately, the Orange Beach location proved to be a decision that not only resulted in the departure of Mr. Dames from the Company, but also the singular largest reason for the filing of this Chapter 11 proceeding.

### III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN.

#### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting Debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the Debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the Debtor may continue to operate its business and remain in possession of its property as a "Debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the Debtor, any person acquiring property under the plan, any creditor or equity interest holder of the Debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the Debtor's liabilities in accordance with the terms of the confirmed Plan.

#### B.    Why is the Debtor sending me this Disclosure Statement?

The Debtor is seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements to be approved by the Court. A copy of a Proposed Order is attached hereto as **Exhibit C** and incorporated herein by reference.

2

### C.   Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims of Park National Bank | Impaired | Entitled to Vote |
| 2 | Secured Claim of Ford Motor Credit Co | Unimpaired | Deemed to Accept |
| 3 | Claims of Gordon Food Service | Impaired | Entitled to Vote |
| 4 | Backstop Acquired Claims of KTM, II | Impaired | Entitled to Vote |
| 5 | Secured Claims of M-2 | Unimpaired | Deemed to Accept |
| 6 | Assumed Executory Contracts | Unimpaired | Deemed to Accept |
| 7 | Unsecured Claims and Rejected Executory Contracts | Impaired | Entitled to Vote |
| 8 | Indemnification Claims of R. Dames | Impaired | Entitled to Vote |
| 9 | Equity Interests | Impaired | Entitled to Vote |

### D.   What will I receive from the Debtor if the Plan is consummated?

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.[2] Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtor to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETEDESCRIPTION OF THE DEBTOR'S CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

Each Holder of an Allowed Claim or Existing Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Existing Interest, except to the extent different treatment is agreed to by the Reorganized Debtor and the Holder of such Allowed Claim or Existing Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Existing Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

---

[2] The Projected Amount of Claims and Recoveries are estimates only and may be affected by ultimate claims allowed and further orders of the Court.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Clas | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Unclassified Non-Voting Claims Against the Debtor | | |
| N/A | Administrative Claims | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction of its Claim, payment in full in cash. | $425,000 | 100% |
| N/A | Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of its Claim, payments in cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. | $269,800 | 100% |
| | | Classified Claims Against and Interests in the Debtor | | |
| 1 | Park National Bank | The Obligations to Park National Bank shall be assumed by the Reorganized Debtor and paid according to terms, with the exception of the claim filed under Proof of Claim 19 in the amount of $250,000.00.  This claims shall be reduced to $200,000 by a payment of $50,000.00 from the Debtor or FDXII under the Backstop Commitment Agreement and upon such payment the balance of $200,000 shall be re-amortized over 8 years and accrue interest at the rate of 6% per annum. | $1,248,663 | 100% |
| 2 | Ford Motor Credit Co | The Obligations to Ford Motor Credit Company shall be assumed by the Reorganized Debtor and paid according to terms. | $19867 | 100% |
| 3 | Gordon Food Service | The Master Distribution Agreement shall be assumed and the cure amount paid in accordance with the terms of the order on assumption which are also included within the Plan terms of treatment. | $321,403 | 100% |
| 4 | KTM, II | The Backstop Commitment obligations acquired and assigned to KTM, II shall be assumed by the reorganized Debtor and paid pursuant to agreement. | $417,417 | 100% |
| 5 | M-2 Leasing | The Obligations to M2 Leasing represented by POC 48 shall be assumed by the Reorganized Debtor and paid according to terms | $25,636 | 100% |
| 6 | Assumed Executory Contracts | The Reorganized Debtor shall assume the executory contracts with The Meyers Y. Cooper Company, IRC Newport, Marshmallow Products and KTM, II for all restaurant locations and shall pay any cure amounts in accordance with the terms between the parties. | $192,432 | 100% |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
|---|---|---|---|---|
| 7 | Unsecured Claims, Rejected Executory Contracts Claims and Convertible Notes | Each holder of an allowed claim in this Class shall be entitled to receive its Pro rate Share of the sum of $75,000.00. | $2,658,738 | .0282% |
| 8 | R. Dames Indemnification Claims | All indemnification claims arising from the Settlement Agreement and General Release (Agreement) between R. Dames and Flipdaddy's, LLC, et. al. shall be satisfied in full by the Contribution and Backstop Commitment Agreement (Agreement) and upon confirmation of the Plan shall constitute full satisfaction of any such claims any result in the release of any such claims held by Mr. Dames against the Debtor and any signatory to the Agreement. | N/A | 100% |
| 9 | Equity Interests | On the Effective Date, each Existing Equity Interest in Flipdaddy's shall be canceled and of no further force and effect. The holder of any existing Class A Membership shall be issued 75% of a new Class A Voting Membership Interest by contribution of new value under the Contribution and Backstop Commitment Agreement. The remaining 25% of the new Class A Voting Membership Interest shall be distributed pro rata to each holder of existing Class B Membership Interests in accordance with their contribution of new value, subject to dilution by new Class A Voting Membership Interests issued in connection with the Management Incentive Plan or the Rights Offering. If Class 9 existing Class B Membership votes to reject the Plan they shall not receive any distribution under the Plan on account of such Existing Membership Interests.. | N/A | N/A |

**E.      What will I receive from the Debtor if I hold an Allowed Administrative Claim, Professional Fee Claim or Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority  Tax Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article II of the Plan.

**1.      Administrative Claims.**

Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section

1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or the Reorganized Debtor, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

## 2.      Professional Fee Claims.

All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed with the Bankruptcy Court no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Fee Escrow Account, which the Reorganized Debtor will establish in trust for the Professionals and fund with Cash equal to the Professional Fee Amount on the Effective Date. Professionals shall deliver to the Debtor their estimates for purposes of the Reorganized Debtor computing the Professional Fee Amount no later than 3 business days prior to the anticipated Effective Date. For the avoidance of doubt, no such estimate shall be deemed to limit the amount of the fees and expenses that are the subject of a Professional's final request for payment of Professional Fee Claims Filed with the Bankruptcy Court. If a Professional does not provide an estimate, the Debtor may estimate the unpaid and unbilled fees and expenses of such Professional. No funds in the Professional Fee Escrow Account shall be property of the Estates, and the Professional Fee Escrow Account shall be maintained in trust solely for the benefit of Holders of Professional Fee Claims. Any funds remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid shall be turned over to the Reorganized Debtor.

From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## 3.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor (with the consent of the Required Consenting Stakeholders, not to be unreasonably withheld) against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for

such Holder, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code and, for the avoidance of doubt, Holders of Allowed Priority  Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance  with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**F.      Are any regulatory approvals required to consummate the Plan?**

There are not expected to be any known regulatory approvals that are required to consummate the Plan.  However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective  Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the D e b t o r  will be able to reorganize its business.  It is possible that any alternative may provide Holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed  description of the consequences of an extended chapter 11 case, or of a liquidation scenario, see Article XI of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," and the Liquidation Analysis attached hereto as **Exhibit D**.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to the Bankruptcy Court's approval of the Plan. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After the Plan  is confirmed, there are conditions that need to be satisfied or waived so that the Plan can be Consummated and go effective. *See* Article XI of this Disclosure Statement entitled "Confirmation of the Plan" for a discussion on the confirmation procedures.

In general, and unless otherwise provided in the Plan, each Holder of an Allowed Claim and Interest shall receive the full amount of the distributions that the Plan provides for such Allowed Claims and Interests in accordance with the applicable Class on the date the Plan becomes effective, *i.e.*, the "Effective Date," or as soon as reasonably practicable thereafter, unless otherwise the Plan provides otherwise.

**I.      Is there potential litigation related to the Plan?**

Parties in interest may object to the Plan being confirmed, which potentially gives rise to litigation.  In the event that it becomes necessary to confirm the Plan over a Class's objection to or vote to reject the Plan, the Debtor may seek to confirm the Plan notwithstanding such objecting Class' dissent.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan that an impaired  class has rejected, if it determines that the plan meets certain requirements for confirmation.

The Bankruptcy Court has established_____, 2019, as the deadline to object to Confirmation of the Plan (the "Plan Objection Deadline"). All objections to the Plan's Confirmation must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in interest in accordance with the order approving the Disclosure Statement and Solicitation Procedures so that they are **actually received** on or before the Plan Objection Deadline. The Debtor believes the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtor, and other parties in interest reasonable time to consider the objections to the Plan prior to a Confirmation Hearing.

**J.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtor's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the following: (a) the Causes of Action released by the Debtor pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtor and Reorganized Debtor as of the Effective Date; and (b) all Causes of Action that arise under sections 544, 547, 548, and 549 of the Bankruptcy Code and state fraudulent conveyance law.

The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it. The Debtor and the Reorganized Debtor expressly reserve all rights to prosecute any and all Causes of Action against any Entity.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtor reserves and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

**K.**      **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties, including each and every signatory to the Settlement and Release Agreement as provided under Class 8 of the Plan.  The Debtor's releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtor's overall restructuring efforts and were an essential element of the negotiations among the Debtor and the other parties to the Contribution and Backstop Commitment Agreement in obtaining their support for the Plan  pursuant to the terms of the Contribution and Backstop Commitment Agreement.

The basis for these provisions is the Sixth Circuit decision of *In Re: Dow Corning Corp., 280 F.3d 648 (2002).*  Included in the Settlement Agreement and General Release were indemnification provisions in favor of Robert Dames and this document was executed by numerous stakeholders of the Debtor. Based on the Contribution and Backstop Commitment Agreement, those stakeholders, are anticipated to be the Released Parties and the Exculpated Parties under the treatment provided under Class 8.  Pursuant to the Contribution and Backstop Commitment Agreement each signatory of the Settlement Agreement and General Release in favor of Robert dames have made substantial and valuable contributions to the Debtor's restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtor for the benefit of all parties in interest. Additionally, the Plan provides through the Contribution and Backstop Commitment Agreement and in particular the indemnification claims or otherwise that may be asserted by Robert Dames under Class 8 of the Plan, a procedure for the satisfaction of all such claims.  In fact, such efforts have already been undertaken and as of the date of this Disclosure Statement, claims in a total amount of $417,417 for which Mr. Dames was a guarantor have been acquired by KTM, II as part of the Backstop Commitment and are treated under Class 4 of the Plan.   Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

**IMPORTANTLY, ALL HOLDERS OF CLAIMS OR INTERESTS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII OF THE PLAN AND OPT OUT OF THE RELEASES ON THEIR BALLOTS WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTOR AND THE RELEASED PARTIES. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

The Debtor believes that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standards promulgated by the United States Court of Appeals for the Sixth Circuit as provided for under *Dow*, supra. Moreover, the Debtor will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction  provisions that are contained in the Plan are copied in pertinent part below.

1.      **Releases by the Debtor.**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtor, the Reorganized D e b t o r , and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtor, that the Debtor, the Reorganized Debtor, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the D e b t o r , based on or relating to, or in any manner arising from, in whole or in part:

(i)      the Debtor, the Debtor's restructuring efforts, the formulation, preparation, dissemination, negotiation, or the Contribution and Backstop Commitment Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

(ii)      any restructuring transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Contribution and Backstop Commitment Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

(iii)      the Chapter 11 Case, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

(iv)      any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud, (ii) the rights of any party under any employment agreement or plan, or
(iii) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

2.      **Releases by Holders of Claims and Interests.**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtor, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(i)      the Debtor, the Debtor's restructuring efforts, or the formulation,

preparation, dissemination, negotiation, or the Contribution and Backstop Commitment Agreement, the Plan, the Disclosure Statement or the Rights Offering Procedures;

(ii)    any restructuring transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Contribution and Backstop Commitment Agreement, the Disclosure Statement, or the Plan, including the Rights Offering;

(iii)    the Chapter 11 Case, the Disclosure Statement, the Plan, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of New Membership Interests pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement; or

(iv)    any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any claims related to any act or omission that is determined in a final order to have constituted actual fraud or (ii) any post-Effective Date obligations of any party or Entity under the Plan, any restructuring transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

3.    Exculpation.

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Settlement and Release Agreement to Robert Dames and as provided under Class 8 of the Plan, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation, filing, or termination of the Contribution and Backstop Commitment Agreement or related post-petition transactions, the Disclosure Statement, the Plan, the Rights Offering, the Rights Offering Procedures, or any restructuring transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Membership Interests pursuant to the Plan or the Rights Offering, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law,

rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

4.      **Injunction.**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities and specifically Robert Dames that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtor, the Reorganized Debtor, or the Released Parties or the Exculpated Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

5.      **Release of Liens.**

Except as otherwise specifically provided in the Plan, the New Second Lien in favor of Gordon Food Service, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtor, or any other Holder of a Secured Claim. In addition, at the sole expense of the Debtor or the Reorganized Debtor, the Holders of Secured Claims shall execute and deliver all documents reasonably requested by the Debtor, Reorganized Debtor to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtor and its designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

**L.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.

**M.      What is the deadline to vote on the Plan?**

The Voting Deadline is _____, 2019 at 4:00 p.m. (EDT).

**N.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2019, at _____,a.m./p.m. (EDT). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation must be filed and served on the Debtor, and certain other parties, by no later than _____, 2019 at 4:00 p.m. (EDT) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order. (See Exhibit C)

**O.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the Debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a Debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a Debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**P.      What is the Rights Offerings?**

The Rights Offering is an opportunity for all Holders of B Membership Interests of the Debtor as well as the general public who are not currently parties to the Contribution and Backstop Commitment Agreement to invest up to a total of $25,000 and receive a pro rata share of the twenty five percent (25%) of the New A Membership Voting Interest of the Reorganized Debtor. The procedures for participating in the Rights Offering are set forth in the Rights Offering Procedures. The Rights Offering Procedures will be authorized pursuant to the Disclosure Statement Order, and described in Article X of this Disclosure Statement, entitled "Rights Offering Procedures.

**Q.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtor's counsel by the following methods

*By regular mail, hand delivery, or overnight mail at:*

13

DILLER  & RICE, LLC
Steven L. Diller (0023320)
124 E. Main Street
Van Wert, Ohio  45891

*By electronic mail at:*
steven@drlawllc.
com

*By telephone at:*
Telephone (419) 238-5025
Facsimile (419) 238-4705

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Case are available upon written request to the Counsel for the Debtor at the address above or by downloading the exhibits and documents from the Bankruptcy Court's website at If you would like to electronically complete and file a Proof of Claim form, you may do so at the following web site: https://www.ohsb.uscourts.gov (for a fee).

**R.     Does the Debtor recommend voting in favor of the Plan?**

Yes. The Debtor believes that the Plan provides for a larger distribution to the Debtor's creditors and equity holders than would otherwise result from any other available alternative. The Debtor believes  that the Plan, contemplates a significant deleveraging of the Debtor's balance sheet and enables it to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims and Interests, and  that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the  Plan.

**S.     Who supports the Plan?**

The Debtor, the Stakeholders who have executed the Contribution and Backstop Commitment Agreement, Thomas Kearney, the sole holder of A Membership Voting Rights of the Debtor, approximately 91% of the existing Class B Membership Interests, the holders of 93% of the convertible notes in existence, the landlords for each remaining Flipdaddy's locations, Park National Bank, the main lender to the Debtor and Gordon Food Service, the main provider of services and food products to the Debtor.

**IV.     THE DEBTOR' CONTRIBUTION AND BACKSTOP COMMITMENT AGREEEMENTAND PLAN.**

**A.     The CONTRIBUTION AND BACKSTOP COMMITMENT AGREEMENT.**

On or about March 15, 2019, the Consenting Stakeholders holding approximately 91% of the existing Class B Membership Interests and the holders of 93% of the convertible notes in existence, Thomas Kearney, KTM, II and FDX, II entered into the Contribution and Backstop Commitment Agreement to aid and  implement restructuring transactions in insuring the treatment of the claims of Robert Dames under Class 8 as well as provide for capital to meet the terms of the Plan on confirmation.  The Restructuring Transactions contemplated by the Plan will significantly reduce the Debtor funded-debt obligations and result in a stronger

balance sheet for the Debtor.

**B.     The Plan.**

The Plan contemplates the following key terms, among others described herein and therein:

**1.     Issuance and Distribution of a New A Class Membership Interests.**

All Existing Interests in Flipdaddy's shall be canceled on the Effective Date and Reorganized Flipdaddy's shall issue the New A Class Membership Interests to Holders of Claims and Interests entitled to receive such interests pursuant to the Plan, the Rights Offering, and the Backstop Commitment Agreement.  The issuance of New A Class Membership Interests shall be duly authorized without the need for any further corporate action and without any further action by the Debtor or Reorganized Debtor or by Holders of any Claims or Interests, as applicable. All New A Class Membership Interests issued under the Plan (including the New A Class Membership Interests underlying the Rights Offering) shall be duly authorized, validly issued, fully paid, and non-assessable.

**2.     The Rights Offering.**

The Debtor shall distribute the Subscription Rights for the Rights Offering to the Rights Offering Offerees as set forth in the Plan and the Rights Offering Procedures. Pursuant to the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Rights Offering shall be open to all Rights Offering Participants.

Upon exercise of the Subscription Rights by the Rights Offering Participants pursuant to the terms of the Backstop Commitment Agreement, the Rights Offering Procedures, and the Plan, the Reorganized Debtor shall be authorized to issue the New A Class Membership Interests in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offering Procedures.

**3.     Exit from the Chapter 11 Proceedings.**

On the Effective Date, the Reorganized D e b t o r shall enter into any documents required in connection with the creation or perfection of assumption of obligations and debts and creation of liens in connection therewith.  The Confirmation Order shall include approval of the Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, authorization of the Reorganized Debtor to enter into and execute the Documents to the extent a party thereto, and authorization for the Reorganized Debtor to create or perfect the Liens in connection therewith.

The lenders under the terms of the Plan shall have valid, binding, and enforceable Liens on the collateral specified in, and to the extent required by, the Documents. To the extent granted, the guarantees, mortgages, pledges, Liens and other security interests granted pursuant to the Documents are granted in good faith as an inducement to the lenders under the Plan to extend credit thereunder and shall be deemed not to constitute a fraudulent conveyance or fraudulent transfer, shall not otherwise be subject to avoidance, and the priorities of any such Liens and security interests shall be as set forth in the relevant Documents.

4.      **Cancellation and Termination of all Convertible Notes**

Confirmation of the Plan shall result in the cancellation and termination of all convertible notes issued and outstanding.  Any convertible note shall be entitled to solely receive its Pro Rata share distributed to unsecured claims under Class 7.

5.      **Recovery to Holders of Existing Membership Interests.**

On the Effective Date, each Existing A. Membership Interest and B Membership Interest held in Flipdaddy's shall be canceled and shall be of no further force and effect.

6.      **General Settlement of Claims and Causes of Action.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration  for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective  Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, Causes of Action, and controversies, as well as a finding by the Bankruptcy Court that such compromise and settlement is in the best interests of the Debtor, the Estate, and Holders of Claims and Interests and is fair, equitable, reasonable, and in the best interests of the Debtor and the Estate.

7.      **Releases.**

The Plan contains certain releases (as described more fully in Article III.K of this Disclosure  Statement, entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?,), including mutual releases among the Debtor, Reorganized Debtor, and certain of key stakeholders. Additionally, all Holders of Claims or Interests that do not file an objection with  the Bankruptcy Court in the Chapter 11 Case that expressly objects to the inclusion of such Holder as  Releasing Party under the provisions contained in Article VIII of the Plan will be deemed to have expressly,  unconditionally, generally, individually, and collectively consented to the release and discharge of all  Claims and Causes of Action against the Debtor and the Released Parties.

V.      **THE DEBTOR'S CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW.**

A.      **The Company's Corporate History.**

The Company was filed with the Secretary of State of Ohio on December 16, 2009 and commenced operations in 2010 being founded by Bob Dames.  Prior to creation of Flipdaddy's, Mr. Dames was a salesman who as a result of his travel requirements would often ask hotel clerks where he could get a "good burger and a beer."  This question ultimately led Mr. Dames into to a five-year-long process of research and seeking funding for the project.  That process led to a proprietary blend of beef used for the burgers, imaginative twists in presentation and utilization of local craft beers.  This  ultimately led to the opening of the first location in the village of Mariemont, Ohio - Flipdaddy's Brilliant Burgers and Craft Beer Bar.

Since that opening, the Company continued to operate and expand, opening it's fourth location in Newport Kentucky in 2015.  This location was the first location built from the ground up, was a combination of the continuing development of the Flipdaddy's theme and brand, was the largest of all the Flipdaddy's locations and was immediately the largest source of revenue to the Company which continues today.  At that time, all four Flipdaddy's locations were within the Cincinnati metropolitan area, though Mr. Dame's vision always included the Flipdaddy's would be a national brand.  In July of 2017, Mr. Dames spearheaded the opening of a fifth location in Orange Beach, Baldwin County Alabama.  Orange Beach is located along the Gulf of Mexico and the easternmost community on Alabama's Gulf Coast.

During this entire time, Mr. Dames sought and gained substantial outside investments, with the singular largest investor being Thomas Kearney.  Mr. Kearney and Mr. Dames became acquainted as a result of their daughters being college roommates at Miami University, Oxford, Ohio.

### B.      Scope of Operations and Business Overview.

As indicated, the Debtor's Operations immediately prior to filing consisted of 5 locations and then reduced to 4 upon the closing of Orange Beach in September 2018.  The Debtor utilizes an accrual method of accounting.   At the time of the filing of this Disclosure Statement and Plan, the Debtor's 2018 tax return is on extension and not yet filed.  Below is a summary of the results of operations for the years 2014 through 2018.[3]

|  |  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Income | Gross Receipts | 7744721 | 7621725 | 7649723 | 7462557 |
|  | Cost of Goods Sold | 2467521 | 2255752 | 2439351 | 2763790 |
|  | Gross Profit | 5277200 | 5365973 | 5210372 | 4698767 |
|  | Other Income |  | 26726 | 127413 | 14729 |
|  | Total Income | 5277200 | 5392699 | 5337785 | 4713496 |
| Deductions | Salaries and wages | 2066413 | 2290762 | 2379106 | 2646208 |
|  | Guaranteed Payments |  |  | 199895 | 37450 |
|  | Repair/maintenance | 200687 | 167780 | 155841 | 183157 |
|  | Rent | 546272 | 635908 | 1107633 | 981565 |
|  | Taxes and Licenses | 473397 | 355149 | 319938 | 373186 |
|  | Interest | 70642 | 146211 | 223934 | 172847 |
|  | Depreciation | 104986 | 88926 | 185340 |  |
|  | Employee Benefits | 16839 | 8242 | 87042 | 44977 |
|  | Other Deductions | 1372545 | 1236247 | 1041056 | 3597856 |
|  | Total Deductions | 4851781 | 4929225 | 5699785 | 6780546 |
|  | Net Income/Loss | 425419 | 463474 | ( 362000) | (2067050) |

### C.      The Debtor's Prepetition Capital Structure.

1.      As of the Petition Date, the Debtor's Equity Interests were held as follows:

---

[3] The years 2015-2017 are based on tax returns and 2018 is based on in house accounting without depreciation.

| Members | Units | Capital Contribution | In Kind Contribution | % |
|---|---|---|---|---|
| **Class A** | | | | |
| KTM, LLC/T. Kearney | 6300 | 910,000.00 | | 100% |
| **Class B** | | | | |
| Edward Biery | 260 | - | Services Rendered | 2.8% |
| Thomas A. Collett | 400 | 100,000.00 | | 4.4% |
| Louis J. Manetti Trust | 100 | 25,000.00 | | 1.1% |
| The Fortuity Group LLC | 600 | 150,000.00 | | 6.5% |
| Pam Kelley & Chris Kelley | 400 | 100,000.00 | | 4.4% |
| John Kearney | 400 | 100,000.00 | | 4.4% |
| Lindsay Garber | 10 | | Services Rendered | 0.1% |
| David Maier | 20 | - | Services Rendered | 0.2% |
| Melissa Sullivan | 10 | | Services Rendered | 0.1% |
| Peter Andruszkiewicz | 50 | 105,882.50 | | 0.5% |
| Doug Reynolds | 20 | 42,353.00 | | 0.2% |
| Iron Family Holdings LLC | 25 | 52,941.25 | | 0.3% |
| Steven A. Crawford | 48 | 101,647.20 | | 0.5% |
| Edward Beadle | 11.8055 | 25,000.00 | | 0.1% |
| 10 Yarmouth Road LLC | 24 | 50,823.60 | | 0.3% |
| Linda Ricca | 2 | 25,411.80 | | 0.1% |
| Arthur Fuller | 23.6111 | 50,000.00 | | 0.3% |
| Thomas A. Sacco | 459 | | Mngt Services | 5.0% |
| **TOTALS** | | 1,839,059.35 | | 100.0% |

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILING.

### A.    Orange Beach Location

The Orange Beach location (like Newport) was also built from the ground up.  A separate, wholly owned subsidiary, Flipdaddy's Alabama, LLC ("the Debtor's subsidiary")  was created by the Company for purposes of leasing the location once completed. At the commencement of this case, the Debtor's subsidiary was party to a Build-to-Suit Lease dated October 11, 2016 ("the Lease") with FD Orange Beach 859, LLC, a Delaware Limited Liability Company ("the Landlord") for property located at 22421 Perdido Beach Blvd., Orange Beach, Alabama. Under Lease, the Debtor's Subsidiary was obligated for a term of 240 months. The Lease was guaranteed by the Debtor pursuant to a Guaranty of Lease dated October 7, 2016.

The location was successful at opening, but by the end of September, 2017, it had begun to experience monthly losses and failed to pay the rent for the month of September, 2017.  Given the cash constraints and the default, Mr. Dames sought an additional cash infusion from Thomas Kearney, who along with Mr. Dames held the voting membership units of the Company. Mr. Kearney immediately engaged in 2018 Mr. Thomas Sacco who had over 30 years experience within the restaurant and food service industries with expertise in all types and sizes of organizations and structures.

Mr. Sacco's involvement and subsequent report resulted in the determination that the Orange Beachy location; unlike all four other locations, was highly seasonal and entirely dependent

18

upon a vacationing customer base as the local population was less than 10,000 year around residents.  It was also determined that the Orange Beach location was losing anywhere from $25,000 to $75,000 a month and it was unlikely that absent concessions and restructuring of the then agreements making up the operation, the Orange Beach location would never reach a break-even point.  Mr. Kearney, as the majority holder of the voting interests, terminated Mr. Dames as an employee of both the subsidiary as well as the Company.

On September 30, 2018, after all efforts at gaining concessions, the decision was made to cease operations and surrendered the Orange Beach location to the landlord.  At the time of surrendering the Orange Beach location, the landlord asserted that basic rent was due in the amount of $278,847.25 for the period and months of September 2017 to and including January 2018, April 2018 through and including August 2018, and October 2018; and real estate taxes of $3,791.49 for the period July 3, 2017 through December 31, 2017, for a total of $282,638.74.

**B.    Litigation**

**1.    The Dames Litigation.**

Upon his termination, Mr. Dames instituted suit in the Hamilton County Court of Common Pleas, in litigation styled, *Dames, et. al. v. Flipdaddy's, et. al*., Case No. A1804099. ("the Dame's Litigation")  This litigation was settled with all of Mr. Dames interest in the Company being acquired.[4]

**2.    The Orange Beach Litigation.**

As noted above, as a result being unable to gain any concessions to permit continued operations, the decision was made to close the location at the end of September 2018.  Thereafter, suit was instituted against the Debtor on October 31, 2018, in the District Court for Dallas County Texas.  The Company evaluated the possibility of settlement by out-of-court transactions, but determined that any such transaction did not adequately resolve the other issues the Company was facing or for which it was at risk of experiencing in the future. Rather than simply hope for a recovery, or enter into  inferior transactions without addressing the viability of the Debtor's capital structure and liquidity issues,  the lack of liquidity for its operations and in order to seek to cap the obligations arising from the Orange Beach operations, the decision was made to seek relief under Chapter 11 and the petition was filed on December 6, 2018.

**VII.   MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASE.**

**A.  Material Post Filing Events**

**a.  Debtor's Operations and the Adverse Effects Upon Filing of this Case.**

Immediately upon the filing and with the news of the filing of this case, the Debtor began to experience a decline in the customer counts because of the apparent perception that the bankruptcy filing was also a cessation of the operations.  However, at

---

[4] The Settlement Agreement and General Release is subject to confidentiality provisions and therefore the terms of the same are not disclosed herein.

the same time, the Debtor also began to experience an increase in customer counts related to holders of various coupon saving programs and gift cards that had been part of the previous marketing efforts. This had a dual effect of reducing revenues, yet still requiring incurring of expenses related to fulfilling the obligations associated with the coupons and gift certificates.

In addition, as a result of the filing, Costco, one of the vendors that had provided for the sale of gift cards issued by the Debtor and purchased by Costco, elected under its agreement with the Debtor to unilaterally suspend payments due the Debtor from the sale of such cards. Added to this was the decision by American Express to also unilaterally withhold payments for meals and services paid for by visiting customers with American Express cards due to the agreement with the Debtor. While both of these events were ultimately resolved and the funds released, the additional effort and time required to deal with the shortfall in revenues and to resolve these matters consumed substantial resources and time to resolve the same. Additionally, the loss of customer count and the general perception that the Debtor has ceased operations has in the belief of management of the Debtor continued to result in a failure to meet the revenue projections even to the date of the filing of this Disclosure Statement. The failure to meet these projections has eliminated any projected cash expenditures for purposes of advertisement and counteracting the negative publicity.

### b. Gordon's Food Service

Gordon's Food Service ("GFS") was and is the main provider of goods and services to the Debtor. These goods and services are provided pursuant to a Master Distribution Agreement (the "MDA") between GFS and the Debtor executed on July 14, 2016. Prior to the filing and under the MDA, GFS provided the Debtor restaurant locations, including the failed Orange Beach facility goods and services. As of the petition date, the Debtor owed GFS $321,403.14 for all goods delivered under the MDA (the "Prepetition Goods Claim"). The GFS Prepetition Goods Claim included $98,125.07 of the Prepetition Goods Claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9) (the "503(b)(9) Claim"); $46,393.15 of the Prepetition Goods Claim is for goods that qualified as "perishable agricultural commodities" under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq.* ("PACA Claim") and $$176,884.92 of the Prepetition Goods Claim is an unsecured claim. ("the Unsecured Claim")

In addition, if the Debtor would not assume the MDA, additional liability would arise including but not limited to a claim for the Debtor's obligation to repay a prorated portion of a signing bonus of the MDA that was utilized in the earlier expansion efforts. The Debtor incurred substantial costs in the development of proprietary products that are exclusively produced for the Debtor by GFS as part of its operations. As a result, the Debtor engaged in extensive negotiations to permit the assumption of the MDA and also provide for the treatment and payment of the GFS Prepetition Goods Claim. This resulted in the filing of a Motion to Assume the Master Distribution Agreement on May

14, 2019 which remains pending at the time of this Disclosure Statement.  (Doc. No. 104)

      **c.**        **Orange Beach**

On  December 20, 2018, the Debtor filed a Motion to Reject the Preferred Developer Agreement as well as the Guaranty of the Orange Beach Lease. (Doc. 23.) This request was granted on February 14, 2019.  Doc. No. 63)  Guggenheim Development filed a proof of claim of $151,984.00 (Proof of Claim 53) and FD Orange Beach 859, LLC filed a proof of claim of 313074.89 (Proof of Claim 54)

      **d.**        **Establishment of the Claim Bar Date**

On February 12, 2019, an order issued establishing the bar date for the filing of general claims to be March 21, 2019 (Doc. No. 57)  This resulted in 52 claims being timely filed of record in this proceeding.  These claims have allowed the Debtor to proceed with the development of the Plan in this cause.

      **e.**        **Class Action Litigation**

On May 1, 2019**,**  a complaint was filed in the United States District Court for the Southern District of Ohio, styled Turner, et. al. v. Flipdaddy's, LLC and assigned Case No. 1:19-cv-314 and served upon the Debtor on May 16, 2019.[5]   This action asserts that it is brought on behalf of the named Plaintiffs as well as all others similarly situated and seeks to recover minimum and overtime wages that is asserted are owed by the Debtor under 29 U.S.C. §§206(a) and 207(a) and also Kentucky Wage and Hour laws.  The Debtor has referred such matter to its insurance carrier and disputes such claims.

## B. Corporate Structure Upon Emergence.

Except as otherwise provided in the Plan (including, for the avoidance of doubt, the Restructuring  Transactions), the Debtor shall continue to exist after the Effective Date as a limited liability company, with all the powers of a limited liability company, pursuant to the  applicable law in Ohio and Kentucky in which it operates, are amended under the Plan or otherwise, and to the extent such documents are amended, such  documents are deemed to be amended pursuant to the Plan and require no further action or approval (other  than any requisite filings required under applicable state, provincial, or federal law).

The following  graphic sets forth for purposes of comparison and illustration the proposed capital structure contemplated  by the Plan and the Contribution and Backstop Commitment Agreement with the Debtor's current capital structure set forth Article V(C)(1), on  page 21.  However; as indicated, pursuant to the Rights Offering and Management Incentives, there could be additional members that would dilute the capital structure.

---

[5] This Complaint was filed in violation of 11 U.S.C. 362 and request of Plaintiff's counsel to dismiss the action was made, but such request remains without reply at the time of filing of this Disclosure Statement.

| HOLDER | Pre-petition Contribution | Pre-Petition Percentage Held | Postpetition Contribution | Percentage Projected |
|---|---|---|---|---|
| KTM/Kearney | 910000 | 0.647 | 300000 | 0.75 |
| Manetti Trust | 25000 | 0.011 | 5000 | .0066 |
| Collett | 100000 | 0.044 | 50000 | .0374 |
| Fortuity | 150000 | 0.065 | 25000 | .05525 |
| Kelly | 100000 | 0.044 | 15000 | 0.0319 |
| John Kearney | 100000 | 0.044 | 25000 | 0.0374 |
| PAndruszkiewicz | 105882 | 0.005 | 50000 | 0.00425 |
| Reynolds | 42353 | 0.002 | 25000 | 0.017 |
| Iron Holdings | 52941 | 0.003 | 25000 | 0.00255 |
| Crawford | 101647 | 0.005 | 50000 | 0.00425 |
| Beadle | 25000 | 0.001 | 25000 | 0.0085 |
| Yarmouth | 50823 | 0.03 | 30000 | 0.0255 |
| Ricca | 25412 | 0.01 | 5000 | 0.0092 |
| Fuller | 50824 | 0.03 | 25000 | 0.0255 |
| Sacco | | 0.05 | | 0.00 |
| Totals | 1839882 | 1.00 | 655000 | 1.00 |

## C.   The Contribution and Backstop Commitment Agreement and Agreements Gained Post-petition

Since the commencement of the proceeding, the Debtor has negotiated a comprehensive financial reorganization pursuant to the Plan, a Contribution and Backstop Commitment Agreement to aid in that Plan, permit assumption and cure of necessary executory contracts, extend maturities, provide a recovery to all stakeholders, and increase liquidity as well as cutoff any further liability for Orange Beach.

The Debtor has a limited number of investors who hold non-voting B membership interests along with preferred unsecured notes thereby constituting a concentrated debtholder composition.   This composition has provided the Debtor with a unique opportunity to negotiate and achieve a comprehensive restructuring transaction including that group. As indicated, the Plan is supported by 91% of the existing Class B Membership Interests and who also hold $760,000 of the convertible notes in existence being approximately 90% of such notes.   This Agreement to support a restructuring will maximize participating stakeholder recoveries and ensure a viable enterprise upon emergence.

Put simply, with stakeholder support in place as well as the agreements with Gordon Food Service, all landlords and the main lender to the Debtor Park National, the Debtor intends to emerge as a stronger, better-capitalized enterprise positioned again to leverage the business platform and brand, generate sustained success along with the effort to once again become a national brand..

Given the Debtor's core strengths, including a n experienced management team and strategic business plan going forward, the management of the Debtor are confident that they can implement the Plan's balance sheet restructuring to ensure the Debtor's long-term viability and success. For these reasons, the Debtor strongly recommend that Holders of Claims and Interests entitled to vote to accept or reject the Plan vote to accept the Plan.

The Contribution and Backstop Commitment Agreement is attached as Exhibit B. The Contribution and Backstop Commitment Agreement was largely a product of the need to comply with the provisions of the Settlement and Release Agreement that was entered into with Robert Dames and to all ensure that those signatories that document would be able by contributing new value to the debtor and the Plan so they could if the Plan is confirmed be protected from any continued litigation based on the provision within that document wherein Robert Dames would be indemnified against "all personal guarantees or obligations ….signed or incurred relating to any Flipdaddy's location."[6] As a result, to insure that such claims would be provided for as required under the *Dow, supra* factors, the need for Backstop Commitments were also required.[7]

The key financial components and commitments of the Contribution and Backstop Commitment Agreement ("the CBC Agreement") are as follows:

- The creation of an entity, FDX II, LLC for the express purpose to gain the commitment and holding the contribution of funds for the of recapitalization of Flipdaddy's, LLC; and
- Gaining the commitment of the holders of all of the voting membership interests of the Debtor ("Class A Interests"), a majority of the nonvoting interests of the Debtor ("Class B Interests"), and also hold a majority of the preferred convertible notes of the Debtor ("Convertible Notes") who as part of a rights offering to purchase New Voting Membership Interests to be issued by the Reorganized Debtor.[8] ("the Contribution")
- As part of the CBC Agreement, Kearney would act, if necessary as a Backstop Commitment Party and in addition KTM, II would also  is willing to act as a Backstop Commitment Party for purposes of either acquiring or paying claims subject to the provisions of the Settlement and Release Agreement the Dames Agreement as set forth herein; and
- If the Plan is confirmed and the injunctive relief granted to all the parties to CBC Agreement, the funds making up the Contribution would be utilized to fund the confirmed Plan.

---

[6] Settlement Agreement and General Release.

[7] Part of the difficulty is that the Settlement Agreement and General Release did not contain a complete listing of such obligations nor did the records of the Debtor contain any such schedule.

[8] Subject to dilution of the New Voting Membership Interests issued (1) in connection with the Management Incentive Plan (5%), or (2) any third party also seeking to purchase New Voting Membership Interests and (3) any contribution required by Kearney as a Backstop Commitment Party to meet the required amount of the Contribution.

As previously indicated, the CBC Agreement was executed on or about March 15, 2019. There are  fifteen signatories to the CBC Agreement and total funds of $355,000 deposited with FDX,II for purposes of implementing the Plan if it is confirmed.

In addition, as part of its Backstop Commitment and the CBC Agreement, KTM, II has moved forward with the resolution of all claims that have been identified to be individually guaranteed by Robert Dames.[9]  It is believed that other than certain priority claims that could be the obligation of Robert Dames[10] as a responsible person and which would be paid at confirmation, all possible claims constituting Class 8 have been resolved and therefore satisfies ) the plan provides a mechanism to pay for all or substantially all of the class or classes affected by the injunction; one of the factors set forth in *Dow, supra* for

The level of consensus for this comprehensive reorganization reflects the efforts undertaken by the  Debtor and the Consenting Stakeholders, and the parties' belief in the Debtor's prospects as a reorganized enterprise.  More importantly, notwithstanding the fact that if the Debtor were liquidated under Chapter 7,  the Plan also proposes to pay in relative terms a material amount to unsecured claims and truly reflects a effort to be fair and equitable.  In so doing, the Plan is intended to eliminate the public perception that the Debtor has closed or is closing and reverse the potential adverse effects to the Debtor's business, customers, and trade partners  as a result of the restructuring, and thus positioning the Debtor for a prompt emergence from bankruptcy.

To fund the Debtor's operations upon emergence from this Chapter 11 Cases, the Reorganized debtor will not only have access to the funds from Contribution but also the Backstop Commitments.  The Debtor believe the combination of these two elements will allow them to operate with stability, and successfully  fund a go-forward business plan.

## VIII.    RISK FACTORS.

Holders of Claims or Interests should read and consider carefully the risk factors set forth below  before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the D e b t o r ' s  b u s i n e s s  or the Plan and its implementation.

**THE DEBTOR HAS PROVIDED THE FOLLOWING RISK FACTOR DESCRIPTIONS TO SATISFY THE DISCLOSURE REQUIREMENTS OF SECTION 1125 OF THE BANKRUPTCY CODE. DISCLOSURE.**

### A.    Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others,  could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not  necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily  require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

---

[9] Proof of Claims 7-14 of Ascentium; Claim Number 29 of Targeted Lease Capital; Claim No. 41 Unify Equipment Finance and Claim No. 47 of M-2 Lease Funds, a total of $417,416.57.
[10] As a "responsible person" under the applicable States statutory framework.

1.    **Parties in Interest May Object to the Plan's Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest  in a particular class only if such claim or equity interest is substantially similar to the other claims or equity  interests in such class.  The Debtor believes that the classification of the Claims and Interests under the Plan  complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of  Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to  the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance  that the Bankruptcy Court will reach the same conclusion.

2.    **The Conditions Precedent to the Effective Date of the Plan May Not Occur.**

As more fully set forth in the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date  will not take place.

3.    **The Debtor May Fail to Satisfy Vote Requirements.**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm  the Plan, the Debtor intends to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the  event that sufficient votes are not received, the Debtor may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction  would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan and the Debtor does not believe that any such transaction exists or is likely to exist that  would be more beneficial to the Estate than the Plan.

4.    **The Debtor May Not Be Able to Secure Confirmation of the Plan.**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any  non-accepting  classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial  reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims or equity interests within a particular class under such plan  will not be less than the value of distributions such holders would receive if the Debtor were liquidated  under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm  the Plan.  A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are

not met.

If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtor will be able to reorganize the business and what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtor, subject to the terms and conditions of the Plan and the Contribution and Backstop Commitment Agreement, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.      Nonconsensual Confirmation.

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class or classes. The Debtor believes that the Plan satisfies these requirements, and the Debtor may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.      Continued Risk upon Confirmation.

Even if the Plan is consummated, the Debtor will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the economy and restaurant industry, and increasing expenses. *See* Article VIII.C of this Disclosure Statement, entitled "Risks Related to the Debtor's and the Reorganized Debtor's Business. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization as reflected in the Plan will achieve the Debtor's stated goals.

The Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor has retained the exclusive right to propose the Plan and has requested an extension of such right (Doc. No. 83) If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve Confirmation of the Plan to achieve the Debtor's stated goals.

Furthermore, even if the Debtor's debts are reduced and/or discharged through the Plan, the Debtor may need to raise additional funds through public or private debt or equity financing or

other various means  to fund the Debtor's business after the completion of the proceedings related to the Chapter 11 Case.  Adequate funds may not be available when needed or may not be available on favorable terms.

**7.      The Chapter 11 Case May Be Converted to Cases under Chapter 7 of the Bankruptcy Code.**

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the Debtor in  a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The  Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being  made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than reorganizing or selling the business as a going  concern at a later time in a controlled manner, (b) additional administrative expenses involved in the  appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled  to priority, that would be generated during the liquidation, including Claims resulting from the rejection of  u nexpired Leases and other Executory Contracts in connection with cessation of operations.

**8.      The Debtor May Object to the Amount or Classification of a Claim or Interest.**

Except as otherwise provided in the Plan, and subject to the terms of the Contribution and Backstop Commitment Agreement, the Debtor reserves the right to object to the amount or classification of any Claim or Interest  under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any Holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions  described in this Disclosure Statement.

**9.      Risk of Non-Occurrence of the Effective Date.**

Although the Debtor believe that the Effective Date may occur quickly after the Confirmation  Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**10.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the  Plan.**

The distributions available to Holders of Allowed Claims or Existing Interests under the Plan can  be affected by a variety of contingencies.. The occurrence of any and all such contingencies, which could affect distributions available to  Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired  Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims and Interests may significantly differ from  the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual  Allowed amounts of Claims and Interests may vary

from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims and Interests that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims and Interests under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved.

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtor, Reorganized Debtor, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtor's reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtor's reorganizational efforts and ins some cases have agreed to make further contributions, but only if they receive the full benefit of the Plan's release and exculpation provisions. The Plan's release and exculpation provisions are an inextricable component of the Contribution and Backstop Commitment Agreement and the significant deleveraging and financial benefits to the Reorganized Debtor.

### B. Risks Related to Recoveries under the Plan.

#### 1. The Reorganized Debtor May Not Be Able to Achieve the Projected Financial Results.

The Reorganized Debtor may not be able to achieve their projected financial results. The financial projections set forth in this Disclosure Statement represent the Debtor's management team's best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtor, as well in the greater Cincinnati Metropolitan area in which the Debtor operates in particular and in general the restaurant industry as a whole (the "Financial Projections"). The Financial Projections are attached hereto as **Exhibit E**. While the Debtor believes that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtor does not achieve the projected financial results, the value of the New A Class Membership Interests may be negatively affected and the Debtor may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtor from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

#### 2. Certain Tax Implications of the Plan.

Holders of Allowed Claims and Interests should carefully review this Disclosure Statement, entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtor and Holders of Claims and Interests entitled to vote on the Plan.

3.      **The Debtor May Not Be Able to Accurately Report Their Financial Results.**

The Debtor has established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtor's financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtor fails to maintain the adequacy of their internal controls, the Debtor may be unable to provide financial information in a timely and reliable manner within the terms of the agreements governing the Debtor's indebtedness. Any such difficulties or failure could materially adversely affect the Debtor's business, results of operations, and financial condition. Further, the Debtor may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtor's business, results of operations, and financial condition.

C.      **Risks Related to the Debtor and the Reorganized Debtor's Business.**

1.      **The Reorganized Debtor May Not Be Able to Generate Sufficient Cash to Service All of its Indebtedness.**

The Reorganized Debtor's ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtor's financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, regulatory, and other factors beyond the Reorganized Debtor's control. The Reorganized Debtor may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtor to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, potential additional borrowings or contributions upon emergence.

2.      **Operating in Bankruptcy for a Long Period of Time May Harm the Debtor's Business.**

The Debtor's future results will be dependent upon the successful confirmation and implementation of a plan of reorganization. Given the impact and adverse results on the Debtor's operations that accompanied the commencement of this case, a long period of operations under Bankruptcy Court protection could have further material adverse effect on the Debtor's business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtor's business. In addition, the longer the proceedings related to the Chapter 11 Case continue, the more likely it is that customers and suppliers will lose confidence in the Debtor's ability to reorganize the businesses successfully and will seek to establish alternative relationships.

So long as the proceedings related to the Chapter 11 Case continue, the Debtor will be required to incur substantial costs for professional fees and other expenses associated with the

administration of the Chapter 11 Cases.

Furthermore, the Debtor cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

3.      **Financial Results May Be Volatile and May Not Reflect Historical Trends.**

If the Chapter 11 case is prolonged, the Debtor expects that the financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtor's financial statements.

In addition, if the Debtor emerges from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtor's operating plans pursuant to a plan of reorganization. The Debtor also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations") in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtor's balance sheets. The Debtor's financial results after the application of fresh start accounting also may be different from historical trends. The Financial Projections contained in **Exhibit E** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

4.      **The Debtor's Liquidity Needs May Impact and Revenue.**

The Debtor operates in a seasonal and capital-intensive industry. The Debtor's principal sources of liquidity historically have been cash flow from operations, borrowings under various bank-funded facilities and capital contributions from stakeholders. If the Debtor's cash flow from operations remains depressed or decreases even lower because of reduced guest counts or expenses increase, or otherwise, the Debtor may not have the ability to expend the capital necessary to improve or maintain their current operations, resulting in decreased revenues over time.

In addition to the cash necessary to fund ongoing operations, the Debtor has incurred significant professional fees and other costs in connection with the Chapter 11 Case and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Case. The Debtor cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund their operations and allow the Debtor to satisfy obligations related to the Chapter 11 Case until the Debtor is able to emerge from bankruptcy protection.

The Debtor's liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) the ability to continue to comply with the terms and condition of the cash collateral orders entered by the Bankruptcy Court in connection with the Chapter 11 Case; (b) the ability to maintain adequate cash on hand; (c) the ability to generate cash flow from operations; (d) the ability to confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and the cost, duration, and

outcome of the Chapter 11 Case. The Debtor's ability to maintain adequate liquidity depends, in part, upon restaurant industry conditions and general economic, financial, competitive, and other factors beyond the Debtor's control. In the event that cash on hand and cash flow from operations are not sufficient to meet the Debtor's liquidity needs, the Debtor may be required to seek additional financing. The Debtor can provide no assurance that additional financing would be available or, if available, offered to the Debtor on acceptable terms. The Debtor's access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtor's long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

> **5.      The Loss of Key Personnel Could Adversely Affect the Debtor's Operations.**

The Debtor's operations have been dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtor's recent liquidity issues and the Chapter 11 Case has created distraction, uncertainty and stress for key management personnel and employees. The Debtor has lost several long term employees in the short time this case has been pending and while such turnover in the restaurant industry can be significant, the Debtor may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtor's ability to operate the business. In addition, a loss of key personnel or material erosion of employee morale at all levels could have a material adverse effect on the Debtor's ability to meet customer expectations, thereby adversely affecting the Debtor's business and the results of operations.

> **6.      Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtor's Financial Condition and Results of Operations.**

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a Debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtor's filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtor's financial condition and results of operations.

## IX.      SOLICITATION AND VOTING PROCEDURES.

This Disclosure Statement, which is accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims and Interests in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to vote to accept or reject the Plan.*

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

**A.     Holders of Claims and Interests Entitled to Vote on the Plan.**

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a Debtor are entitled to vote on a chapter 11 plan. The table in Article III.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

The Debtor is soliciting votes to accept or reject the Plan from Holders of Claims and Interests in Class 1,Class 3,Class 4, Class 7, Class 8 and Class 9 (collectively, the "Voting Classes"). The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims or Interests in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtor is *not* soliciting votes from Holders of Claims or Interests in Classes 2,5 and 6. Additionally, the Disclosure Statement Order provides that certain Holders of Claims or Interests in the Voting Classes, such as those Holders whose Claims or Interests have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

**B.     Voting Record Date.**

**The Voting Record Date is_____, 2019**. The Voting Record Date is the date on which it will be determined which Holders of Claims and Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims and Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim or Interest.

**C.     Voting on the Plan.**

**The Voting Deadline is_____, 2019 at 4:00 p.m. (EDT)**.. In order to be counted as votes to accept or reject the Plan, all ballots must be (1) properly executed, completed, and delivered (either by using the envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

*By regular mail, hand delivery, or overnight mail at:*

DILLER  & RICE, LLC
Steven L. Diller (0023320)
124 E. Main Street
Van Wert, Ohio  45891

---

**PLEASE SELECT JUST ONE OPTION TO VOTE.
EITHER RETURN PROPERLY EXECUTED PAPER BALLOT WITH
YOUR VOTE OR
VOTE VIA ELECTRONIC MAIL TO**
*:*

steven@drlawllc.com

**Holders of Claims or Interests who cast a ballot via electronic mail to steven@drlawllc.com should NOT also submit a paper ballot.**

**FOR ANY BALLOT CAST VIA ELECTRONIC MAIL, THE RECEIVED DATE AND TIME IN THE INBOX WILL BE USED AS THE TIMESTAMP FOR RECEIPT.**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT STEVEN L. DILLER AT (419) 238-5025. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED.**

      **D.**      **Ballots Not Counted.**

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or  contains insufficient information to permit the identification of the Holder of the Claim or Interest; (2) it  was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that  is not entitled to vote on the Plan; (4) it was cast for a Claim or Interest listed in the Debtor's  schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim  was timely filed; (5) it was cast for a Claim or Interest that is subject to an objection pending as of the  Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it  was sent to the Debtor, (7) it is unsigned; or (8) it is not clearly  marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject  the Plan.**

      **X.**      **RIGHTS OFFERING PROCEDURES.**

The procedures and instructions for exercising Subscription Rights, as applicable, are set

forth in the Rights Offering Procedures. The Rights Offering Procedures will be authorized pursuant to the Disclosure Statement Order, which is attached to this Disclosure Statement as **Exhibit C**. The Rights Offering Procedures are incorporated herein by reference and should be read in conjunction with this Disclosure Statement in formulating a decision to exercise Subscription Rights. *The discussion of the Rights Offering Procedures set forth in this Disclosure Statement is only a summary. Please refer to the Rights Offering Procedures attached hereto for a more comprehensive description.*

**IN ORDER TO PARTICIPATE IN THE RIGHTS OFFERING, EACH ELIGIBLE HOLDER MUST COMPLETE ALL THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES. IF ALL OF THE STEPS OUTLINED IN THE RIGHTS OFFERING PROCEDURES ARE NOT COMPLETED BY THE SUBSCRIPTION EXPIRATION DEADLINE OR THE BACKSTOP FUNDING DEADLINE, AS APPLICABLE, THE ELIGIBLE HOLDER SHALL BE DEEMED TO HAVE FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED ITS RIGHT TO PARTICIPATE IN THE RIGHTS OFFERING.**

## XI.  CONFIRMATION OF THE PLAN.

### A.  Requirements for Confirmation of the Plan.

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests[11], or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtor has complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.  Best Interests of Creditors/Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the Debtor liquidated under chapter 7.

---

[11] A class of claims or equity interests is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan:

(a)        leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

(b)

Attached hereto as **Exhibit D** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtor with the assistance of the Debtor's advisors. As reflected in the Liquidation Analysis, the Debtor believes that liquidation of the Debtor's business under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims or Interests as compared to distributions contemplated under the Plan. Consequently, the Debtor and its management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims or Interests than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtor fails to propose and confirm an alternative plan of reorganization, the Debtor's business may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtor's assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7. Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Any distribution to Holders of Claims or Interests (to the extent Holders of Interests would receive distributions at all) under a chapter 11 liquidation plan would most likely be substantially delayed. Most importantly, the Debtor believes that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New A Class Membership Interests to be distributed under the Plan. Accordingly, the Debtor believes that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtor, with the assistance of its advisors and managements, have analyzed their ability to meet their respective obligations under the Plan. Creditors and other interested parties should review Article VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

The Financial Projections attached hereto as **Exhibit E** and incorporated herein by reference. Based upon the Financial Projections, the Debtor believes that it will be a viable operation following the Chapter 11 Case and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### D.    Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances

with respect to such a class is not required.[12]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interest as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims or interests in that class, counting only those claims or interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Claims or Interests will have voted to accept the Plan
only if two-thirds in amount and a majority in number of the Allowed Claims or Interests in such class that  vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity  interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Existing Interests in such class that vote  on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### E.       Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all  impaired classes have not accepted it; *provided*, that the plan has been accepted by at  least  one  impaired  class.  Pursuant  to  section  1129(b)  of  the  Bankruptcy  Code, notwithstanding an impaired class's rejection  or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure  commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and  equitable" with respect to each class of claims or equity interests that is Impaired under, and has not  accepted, the plan.

If any impaired class rejects the Plan, the Debtor reserves the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any  impaired class rejects the Plan or is deemed to have rejected the Plan, the Debtor may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtor reserves the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement  document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the  requirements of section 1129(b) of the Bankruptcy Code.

### 1.       No Unfair Discrimination.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority  and are receiving different treatment under a plan.  The test does not require that the

---

[9]    Terms used in this Article X but not otherwise defined in this Disclosure Statement or the Plan have the meanings, if any, given to them in the Rights Offering Procedures.

[10]

treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.     Fair and Equitable Test.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims or interests receive more than 100% of the amount of the allowed claims or interests in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtor submits that if the Debtor "cramdowns" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the
Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes  that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims or Interests in that Class. The Debtor believes that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements  for nonconsensual Confirmation of the Plan.

### F.     Valuation of the DEBTOR.

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the  Bankruptcy Code, the Debtor determined that it was not necessary to estimate the post-Confirmation going  concern value of the Debtor. Accordingly, the Debtor does not include any Valuation Analysis on a go forward basis.  The basis for this determination is that absent the involvement and backing of the stakeholders, the consensus and support of the Plan would be eliminated.  If a Plan is confirmed without involvement of the stakeholders, the support of the Lender, Gordon Food Service and the landlords would be eliminated as well.  These facts along with the Liquidation Analysis further supports the Debtor's conclusion that the treatment of Classes under the Plan is fair and equitable and otherwise satisfies the Bankruptcy Code's requirements for confirmation.

## XII.     CERTAIN SECURITIES LAW MATTERS.

### A.     New A Class Membership Interests and Rights Offering Shares

As discussed herein, the Plan and the Contribution and Backstop Commitment Agreement provides for Reorganized Flipdaddy's to distribute: (1) New A Class Membership Interests  to Holders of Existing Class A and Class B Membership Interests under the Contribution and Backstop Commitment Agreement (2) New A Class Membership Interests  under the Management Incentive Plan; (3) New A Class Membership Interests  consisting of Unsubscribed Shares issued to any individual that seeks to acquire such interests under the Rights Offering.

The Debtor believes that the offer and if applicable the sale of the New A Class Membership Interests, pursuant to the Plan and the Contribution and Backstop Commitment Agreement is, and subsequent transfers of the New A Class Membership Interests will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law.

**RECIPIENTS OF NEW A CLASS MEMBERSHIP INTERESTS AND NEW WARRANTS ARE URGED TO CONSULT WITH THEIR OWN LEGAL ADVISORS AS TO THE AVAILABILITY OF ANY EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE BLUE SKY LAW.**

B.    **New A Class Membership Interests and the Management Incentive Plan.**

The Confirmation Order shall authorize the Reorganized Flipdaddy's Board to adopt and enter into the Management Incentive Plan. The issuance of New A Class Membership Interests , if any, under the Management Incentive Plan would dilute all New A Class Membership Interests issued pursuant to the Restructuring Transactions. The New A Class Membership Interests, including New A Class Membership Interests issued under the Management Incentive Plan, is also subject to dilution in connection with the exercise of the Rights Offering.

XIII.   **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.**

A.    **Introduction.**

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the DEBTOR, the Reorganized DEBTOR, and certain Holders of Claims and Interests entitled to vote on the Plan, and it does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder ("Treasury Regulations"), judicial decisions, revenue rulings and revenue procedures of the Internal Revenue Service (the "IRS"), and any other published administrative rules and pronouncements of the IRS, all as in effect on the date hereof (collectively, "Applicable Tax Law"). The Debtor has not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein. Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein. The discussion below is not binding upon the IRS or the courts, and no assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local or non-income tax consequences of the Plan (including such consequences with respect to the Debtor or the Reorganized Debtor), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtor within the meaning of the Tax Code, persons liable for alternative minimum tax, U.S. holders whose functional currency is not the U.S. dollar, U.S. expatriates, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, controlled foreign corporations, passive foreign investment

companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims or Interests who will hold the New A Class Membership Interests  as part of a straddle, hedge, conversion transaction, or other integrated investment, persons  using a mark-to-market method of accounting, and Holders of Claims or Interests who are themselves in  bankruptcy). Furthermore, this summary assumes that a Holder of a Claim or Interest holds only Claims  or Interests in a single Class and holds such Claims or Interests only as a "capital asset" (within the meaning  of section 1221 of the Tax Code).  This summary also assumes that the Claims to which any of the Debtor are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtor "solely as a creditor" for purposes of section 897 of the Tax Code. The U.S. federal income tax consequences of the implementation of the Plan to the Debtor, the Reorganized Debtor, and Holders of Claims and Interests described below also may vary depending on  the nature of any Restructuring Transactions that the Debtor and/or Reorganized Debtor engage in. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or  deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest (including  a beneficial owner of Claims or Interests) that, for U.S. federal income tax purposes, is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of  the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject  to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more  United States persons (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control  all substantial decisions of the trust or (b) that has a  valid election in effect under applicable Treasury Regulations to be treated as a United States person.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership  (or other entity treated as a  partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal  income tax purposes) is a Holder of a Claim or Interest, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of  the entity.  Partners (or other beneficial owners) of partnerships (or other entities treated as partnerships or  other pass-through entities for U.S. federal income tax purposes) that are Holders of Claims or Interests are  urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

*[Remainder of page intentionally left blank.]*

**RECOMMENDATION.**

In the opinion of the Debtor, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtor's creditors than would otherwise result in any other scenario. Accordingly, the Debtor recommends that Holders of Claims or Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: May 22, 2019                                FLIPDADDY'S, LLC

                                                   By_____
                                                           Thomas Sacco
                                                   Chief Executive Officer